UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BERNARD E. BULWER, M.D., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 23-cv-11097-ADB |
| ECHONOUS, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

     Plaintiff Dr. Bernard E. Bulwer ("Plaintiff" or "Bulwer") brings claims for unjust enrichment and quantum meruit in connection with services he provided to Defendant EchoNous, Inc. ("Defendant" or "EchoNous"), a company that makes software for ultrasounds. [ECF No. 1 ("Compl." or "Complaint") ¶¶ 8, 19–30]. Now pending before the Court is EchoNous' motion to dismiss or, in the alternative, to transfer venue. [ECF No. 9]. For the reasons set forth below, the motion is <u>DENIED</u>.

**I.    BACKGROUND**

    **A.    Factual Background**

    The following facts are drawn from the Complaint, the well-pleaded allegations of which are taken as true for purposes of evaluating the motion to dismiss. <u>See</u> <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).[1] In addition, the Court considers the October 26,

---

[1] With respect to the alternative request to transfer venue, the Court can draw facts from the complaint and evidence the parties have proffered in support of their jurisdictional arguments. <u>See</u> <u>Egan, Flanagan & Cohen, P.C. v. Twin City Fire Ins. Co.</u>, 570 F. Supp. 3d 12, 14 (D. Mass.

2021, Independent Contractor Agreement between Bulwer and EchoNous, [ECF No. 10-1 (the "Agreement")], which is not attached to the Complaint, but the authenticity of which is not disputed and which is central to the claims at issue here.  See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (although "[o]rdinarily, . . . any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden[] unless the proceeding is properly converted into one for summary judgement," courts "have made narrow exceptions for documents the authenticity of which are not disputed by the parties; . . . for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint"); see also [ECF No. 13 at 2–3 ("disput[ing] EchoNous' ability to refer to a document outside the four corners of the complaint," but not arguing that the Agreement is inauthentic, and also stating that "[t]he contract at issue here is the Agreement, a contract by and between Dr. Bulwer and EchoNous, with an Effective Date of October 26, 2021")].

1.    The Parties

"Bulwer is a medical doctor who specialized in echocardiography (cardiac ultra-sound)." [Compl. ¶ 3].  He is a resident of Boston, Massachusetts.  [Id.].

EchoNous is a company that sells an "FDA-approved point-of-care ultrasound (POCUS) device called 'Kosmos.'"  [Compl. ¶ 8].  It is a for-profit Delaware corporation with its principal place of business in Redmond, Washington.  [Id. ¶ 4].  It is also "a registered corporation" in Massachusetts and has a registered agent in Boston.  [Id.].

_____

2021) ("In making its [jurisdictional] determination, the Court is not . . . constrained to the allegations in the complaint, and may consider affidavits and other relevant materials.").  To the extent that any facts are not in the Complaint but are discussed in the parties' arguments relevant to transfer, the Court addresses those facts below and not in this summary of the facts.

2.   Pre-October 2021 Agreement Events

Around June 2020, EchoNous approached Bulwer to see if he would provide "expertise, materials, and services it needed to complement the echocardiography-related software" in the Kosmos device.  [Compl. ¶ 8].  Specifically, they asked him "to help solve echocardiography-related software issues and problems they encountered with the original Kosmos artificial intelligence (AI)-enabled heart software known as the TRIO, as well as related problems with the two-day novice-user training method [EchoNous] employed."  [Id. ¶ 9].  He was ultimately "tasked by [EchoNous]'s cofounders, and previous executives, including key software and clinical staff," with (1) "solv[ing] key design flaws identified in the" Kosmos software, and (2) "produc[ing] highly instructive training materials to simplify, improve, and scale a new training protocol for novice ultrasound users."  [Id. ¶ 10].

  "As requested," Bulwer then "provided expert leadership" and other specific services "for the development of the new and improved Kosmos . . . software (dubbed TRIO 2.0)." [Compl. ¶ 11].  He also "initiated, developed, and supervised a successful novice training method."  [Id.].  He performed these tasks "primarily from Boston, MA."  [Id.].

Between October 2 and 4, 2021, Bulwer "pre-piloted" the TRIO 2.0 software and ran a training with novice users in Redmond, WA.  [Compl. ¶ 12].  Bulwer alleges that "[b]oth the improved TRIO 2.0 [software] and the successful novice user training protocol are key components in [EchoNous]'s pursuit of FDA approval for its Kosmos" device.  [Id.].

Bulwer also alleges that his services during this time benefited EchoNous.  First, Bulwer "provided [EchoNous] with the foundation for expanding and scaling Kosmos' . . . sales strategies for echocardiography . . . applications and services globally," including a "partnership with US2ai, an AI software company whose software can automatically analyze heart images acquired using the Kosmos TRIO 2.0" software.  [Compl. ¶ 13].  Second, he helped "solve[] the

'ease of use' shortfalls noted by [EchoNous], as well as in a published report in a scientific ultrasound journal." [Id. ¶ 14].  Third, "[t]he result and benefit of Dr. Bulwer's . . . services . . . was a 'best-in-class,' 'improved,' and 'enhanced' TRIO 2.0 [software] as universally marketed by [EchoNous]." [Id.].  Overall, the improved software product and training has been "ubiquitously messaged" and marketed, and "is central to Kosmos' market expansion and sales strategy, including its partnership with US2ai." [Id.].

EchoNous' "cofounders and their former CEO consistently acknowledged the value provided by Dr. Bulwer.  For example, the cofounders and former executives of Defendant designated Dr. Bulwer [their] 'authority on the heart.'  Defendant also made it known that 'Bernard [Dr Bulwer] is highly valued.'" [Compl. ¶ 15].  Moreover, "[t]he parties both reasonably expected that Dr. Bulwer would be compensated for the expertise, materials, and services he provided to [EchoNous] from June 2020 through October 25, 2021." [Id. ¶ 16].  For example, Bulwer avers that "in 2020, Kevin Goodwin, Defendant's co-founder and former CEO[,] wrote to Dr. Bulwer that '[i]mportantly, we will cut you in on the economics.'" [Id.].  He alleges that "[t]o date," though, he "has not been sufficiently compensated for the benefit he conferred upon EchoNous from June 2020 through October 25, 2021." [Id. ¶ 18].

### 3.   The October 2021 Agreement

On October 26, 2021, EchoNous and Bulwer signed an "Independent Contractor Agreement." [Agreement at 1, 7].  The Agreement provides that EchoNous "engages" Bulwer "as an independent contractor to provide certain services to [EchoNous] on the terms and conditions set forth in this Agreement.  This Agreement shall commence on October 26, 2021 (the 'Effective Date')." [Id. § 1.1].  Further, it states that "[t]he term of this Agreement shall commence on the Effective Date and shall continue for a period of 12 months or until the Services [are] completed." [Id. § 2].  The "Services" to be provided are defined as the following:

Advisor to the Company in the field of Cardiology.  As a Cardiology Advisor, Contractor will be responsible for the strategy, direction and execution of initiative to build global adoption of the Company's product in cardiology in close collaboration with the CEO.  Specifically, Contractor will be responsible for the following:

a. Guiding overall evidence development strategy to support reimbursement, protocol integration, and regulatory approvals, including guidance regarding clinical utility and health economic/outcomes research studies in cardiology.

b. Providing medical and clinical leadership in future product development with focus in cardiology.

c. Lead in the Company's efforts in educating physicians, payers, regulators in the value of Kosmos and other Company products in cardiology.

d. Represent the medical/clinical perspective in board meetings, investor meetings, regulatory and medical communities, and collaborators/partners and other meetings with key stakeholders in the area of cardiology, as requested from time to time.

e. In collaboration with the Chief Innovation Officer, provide key guidance for the development of new products and features for cardiology.

f. Monitor competitive landscape closely and assist company in responding to competitive threats in cardiology.

g. Provide clinical support and work with other members of the management team to develop and communicate the overall corporate strategy.

h. Other duties as mutually agreed from time to time.

[Agreement § 1.2, Schedule 1].

Regarding payment, the Agreement provides that "[a]s full compensation for the Services and the rights granted to [EchoNous] in this Agreement, [EchoNous] shall pay [Bulwer] the fees set forth on Schedule 1 (the "Fees")," which is "Fifteen Thousand Dollars per month USD ($15,000) to be paid by EchoNous, Inc."  [Agreement § 3.1, Schedule 1].  EchoNous also "agrees to use its commercially reasonable efforts to grant such number of stock options in the Company ('Grant') that, in the Company's sole judgment and discretion, reflect [Bulwer]'s contribution to the Company," subject to certain conditions.  [Id. at Schedule 1].

As for additional relevant provisions, the Agreement has a forum selection clause that states the following:

> 13.3    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington without giving effect to any choice or conflict of law provision or rule.  Any legal suit, action or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of Washington in each case located in the city of Seattle and County of King, and you irrevocably submit to the exclusive jurisdiction of such courts in any such suit, action or proceeding and waive any objection based on improper venue or forum non conveniens. . . .

[Agreement § 13.3 (the "Forum Selection Clause")].  In addition, it has an integration clause that provides the following:

> 13.4    This Agreement . . . constitutes the sole and entire agreement between you and the Company with respect to the subject matters contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by you and the Company.

[Id. § 13.4 (the "Integration Clause")].

## B.    Procedural History

Bulwer filed the Complaint in this Court on May 16, 2023.  [Compl.].  On August 7, 2023, EchoNous moved to dismiss or, in the alternative, to transfer venue to the Western District of Washington.  [ECF No. 9].  Bulwer opposed on August 28, 2023, [ECF No. 13], and EchoNous filed a reply on September 20, 2023, [ECF No. 16].

## II.    MOTION TO DISMISS

### A.    Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff.  U.S. ex rel.

Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice."  MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).  "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

B.     **Discussion**

EchoNous argues that the Complaint should be dismissed because (1) "the parties have a fully integrated agreement which precludes Bulwer's claims," (2) "the agreement contains a mandatory forum selection clause requiring litigation in Washington State," and (3) "Bulwer fails to plausibly allege the required elements of his claims."  [ECF No. 10 at 1].  In response, Bulwer generally argues that (1) he provided services prior to the Effective Date of the Agreement that do not arise out of or relate to the Agreement and thus are not within its scope,

[ECF No. 13 at 1–2], and (2) the Complaint puts EchoNous on sufficient notice of the claims to survive a motion to dismiss, [id. at 2].

       1.      Whether the Agreement Applies to Bulwer's Pre-October 26, 2021 Work

Bulwer generally argues the Agreement covered only work performed starting on October 26, 2021, and not any work that was done prior to that date. See [ECF No. 13 at 3]. EchoNous, on the other hand, responds that the Agreement covers work done prior to October 26, 2021, by virtue of the Integration Clause. See [ECF No. 10 at 7].

Under Massachusetts law, "[w]hen the language of a contract is clear, it alone determines the contract's meaning." James B. Nutter & Co. v. Estate of Murphy, 88 N.E.3d 1133, 1138 (Mass. 2018) (quoting Balles v. Babcock Power Inc., 70 N.E.3d 905, 911 (Mass. 2017)). "Contractual language is ambiguous 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" Id. (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)). "When the language is ambiguous, it is construed against the drafter, 'if the circumstances surrounding its use . . . do not indicate the intended meaning of the language.'" Id. at 1139 (quoting Merrimack Valley Nat'l Bank v. Baird, 363 N.E.2d 688, 690 (Mass. 1977)). "The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party." Id. (quoting Baird, 363 N.E.2d at 690). Finally, courts "construe a contract as a whole, so as 'to give reasonable effect to each of its provisions.'" Id. (quoting J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986)).

Here, the Agreement unambiguously states that the Services provided under the Agreement "shall commence on the Effective Date and shall continue for a period of 12 months or until the Services [are] completed." [Id. § 2]; see also [id. § 1.1 (EchoNous "engage[d]" Bulwer "as an independent contractor to provide certain services to [EchoNous] on the terms and

conditions set forth in this Agreement.  This Agreement shall commence on October 26, 2021 (the 'Effective Date').")].

In addition, it is unambiguous as to the fact that the payment is "for the Services and the rights granted to [EchoNous] in this Agreement," i.e., the services that began on October 26, 2021.  [Id. § 3.1, Schedule 1 ("[a]s full compensation for the Services and the rights granted to [EchoNous] in this Agreement, [EchoNous] shall pay you the fees set forth on Schedule 1 (the "Fees")," which is "Fifteen Thousand Dollars per month USD ($15,000) to be paid by EchoNous, Inc.")].

Finally, the Integration Clause provides that the Agreement "constitutes the sole and entire agreement between [Bulwer] and the [EchoNous] with respect to the subject matters contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter."  [Id. § 13.4 (emphasis added)].  The Court understands this Integration Clause to apply to the Services contemplated by the Agreement, not prior services.  Even if it is arguably ambiguous, accepting Bulwer's allegations that he has not sufficiently been paid for pre-October 26, 2021 work, [Compl. ¶ 18], and construing any possible ambiguity against EchoNous, see James B. Nutter & Co., 88 N.E.3d at 1139; see also [Agreement at 1 (Agreement drafted as a letter from EchoNous to Bulwer)], the Court finds that there is no indication that the Integration Clause (or any other clause in the Agreement) is meant to apply the Agreement's terms retroactively to work performed prior to October 26, 2021, see generally [Agreement].[2]

---

[2] Defendants will of course be entitled to discovery into whether, for example, the Agreement was meant to cover the work performed by Bulwer prior to October 26, 2021.  To the extent that evidence confirms or strongly suggests that the Agreement was meant to apply retroactively to work performed before it was signed, that would likely have great weight for the Court in

Accordingly, the Court finds, based on the clear language of the Agreement and the facts alleged by Bulwer, that the Agreement does not cover services Bulwer provided prior to October 26, 2021.[3]

2.      The Forum Selection Clause

Notwithstanding the fact that, on the present record, the Agreement does not cover services Bulwer provided prior to October 26, 2021, see supra, the Court considers whether those services are sufficiently "related to" the Agreement such that the Forum Selection Clause applies.  See [Agreement § 13.3].  The Forum Selection Clause provides that

> [t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington without giving effect to any choice or conflict of law provision or rule.  Any legal suit, action or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of Washington in each case located in the city of Seattle and County of King, and you irrevocably submit to the exclusive jurisdiction of such courts in any such suit, action or proceeding and waive any objection based on improper venue or forum non conveniens. . . .

[Agreement § 13.3 (emphasis added)].

---

deciding whether, for example, the Integration Clause and Forum Selection Clause apply to this dispute at the summary judgment stage.

[3] EchoNous cites Guldseth v. Family Med. Assocs. LLC, No 17-cv-12112, 2021 WL 681913, (D. Mass. Feb. 22, 2021), aff'd, 45 F.4th 526 (1st Cir. 2022), in support of its position, [ECF No. 10 at 6–8], but this case is different from Guldseth.  The primary dispute in Guldseth was whether a prior promise that the plaintiff doctor would get a partnership interest in a medical practice was fairly incorporated into his employment agreement.  See id. at *5. There, the plaintiff Doctor performed all his work for the employer after having entered into an employment agreement that (1) said nothing about the partnership interest, and (2) contained an integration clause that, as the Court found, superseded any oral agreements relating to the work performed under the employment agreement.  See id.; see also id. at *2–3 (providing the timeline for when the doctor signed his employment agreement and began work).  In contrast, the issue here is compensation and the terms surrounding work done prior to the effective date of the Agreement at issue.  See [Agreement §§ 1.1, 3.1, Schedule 1].

EchoNous argues that "related to" is interpreted broadly, and that the "claims [here] relate to the services contemplated by the Agreement."  [ECF No. 10 at 12; ECF No. 16 at 4–5]. In response, Bulwer argues that his claims "do not arise out of or relate to the Agreement," and instead relate to services that were provided before the Agreement's Effective Date.  [ECF No. 13 at 5–8].

When deciding whether claims "relate to" a contract such that a forum selection clause applies, courts consider whether "the principal focus of the plaintiff['s] claims" is the contract, and if it is, "the judge should enforce the clause" because "[a] plaintiff should not be allowed to vitiate the effect of a forum selection clause simply by alleging peripheral claims that fall outside its apparent scope."  Bay State Anesthesia, Inc. v. Mallinckrodt, Inc., No. 02-cv-11174, 2002 WL 31761286, at *1 (D. Mass. Dec. 6, 2002) (first alteration in original) (quoting Jacobson v. Mailboxes Etc. U.S.A., Inc., 646 N.E.2d 741, 746 (Mass. 1995)).  In Bay State Anesthesia, for example, the court declined to apply a forum selection clause where "the bulk of plaintiff's allegations involve[ed] conduct that was unrelated to the contract's terms and that occurred after the contract was terminated."  Id.; see also Jacobson, 646 N.E.2d at 745–46 (finding the "forum selection clause [at issue] d[id] not apply to wrongs that [Defendant] allegedly committed before the parties entered into a contractual relationship" where "[t]he forum selection clause by its terms relates only to actions to enforce the agreement and not to actions based on unlawful conduct that induced a franchisee to sign the agreement").

Here, having construed the Agreement to not cover the services provided by Bulwer prior to October 26, 2021, see supra, and accepting Bulwer's allegations that he has not been paid for those services, see [Am. Compl. ¶ 18], the Court finds that the principal focus of the claims here

is on work provided outside the scope of the Agreement, and thus the claims are not sufficiently related to the Agreement for the Forum Selection Clause to apply.

3.   Whether Bulwer has Stated a Claim for Relief

The Court next turns to whether Bulwer has stated a claim for relief.[4]  "Quantum meruit and unjust enrichment are treated similarly, as both have essentially the same elements."  Barnia v. Kaur, 646 F. Supp. 3d 154, 168 (D. Mass. 2022) (citing Lockwood v. Madeiros, 506 F. Supp. 3d 73, 80 (D. Mass. 2020)).  To state a claim for unjust enrichment in Massachusetts, "the plaintiff must allege: '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value.'"  Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009)).  Similarly, to state a claim for quantum meruit, "a plaintiff [must] show that (1) he rendered services to the defendants; (2) the defendants accepted services; (3) he expected reasonable compensation; and (4) the measure of reasonable value of services he provided."  Barnia, 646 F. Supp. 3d at 168 (citing Lockwood, 506 F. Supp. 3d at 80–81).  As to the final element regarding the "measure of reasonable value," courts appear to have held that the question is not necessarily whether the Plaintiff has alleged a specific measure of the value provided, but instead whether he has alleged a benefit that is measurable.  See Depianti v. Jan-Pro Franchising Intern., Inc., 39 F. Supp. 3d

---

[4] EchoNous argues that Bulwer is not entitled to recovery because "recovery under a theory of unjust enrichment or quantum meruit is only available where a plaintiff has no other available remedy under the law," and here the parties have "a valid contract that covers the same subject matter and defines the obligations of the parties."  [ECF No. 10 at 5 (first citing Scarpaci v. Lowe's Home Ctr., LLC, 212 F. Supp. 3d 246, 253 (D. Mass. 2016); and then quoting Neff Grp. Distribs., Inc. v. Cognex Corp., No. 22-cv-11270, 2022 WL 17156025, at *5 (D. Mass. Nov. 22, 2022))].  Because the Court finds that the Agreement does not cover the conduct at issue in the claims, see supra, this argument is without merit.

112, 141 (D. Mass. 2014) ("Under this theory of recovery, the 'reasonable benefit' bestowed by the plaintiff must be 'measurable.'"), aff'd on other grounds, 873 F.3d 21 (1st Cir. 2017); Comm. Aluminum Corp. v. Baldwin Corp., 980 F. Supp. 598, 607 (D. Mass. 1997) ("One essential element for recovery in quantum meruit . . . is that the plaintiff conferred a measurable benefit on the defendant."); Bolen v. Paragon Plastics, Inc, 747 F. Supp. 103, 106 (D. Mass. 1990) ("The first element that [plaintiff] must allege is that he conferred a measurable benefit.").

Here, Bulwer alleges, among other things, that (1) he "provided expert leadership" and other specific services "for the development of the new and improved Kosmos . . . software (dubbed TRIO 2.0)," [Compl. ¶ 11], and that he also "initiated, developed, and supervised a successful novice training method," [id.]; (2) EchoNous' "cofounders and their former CEO consistently acknowledged the value provided by Dr. Bulwer," [id. ¶ 15]; (3) "[t]he parties both reasonably expected that Dr. Bulwer would be compensated for the expertise, materials, and services he provided to [EchoNous] from June 2020 through October 25, 2021," [id. ¶ 16]; see also, e.g., [id. ¶ 16 (alleging that "Kevin Goodwin, Defendant's co-founder and former CEO[,] wrote to Dr. Bulwer that '[i]mportantly, we will cut you in on the economics,'" and alleging that "[t]o date . . . [Bulwer] has not been sufficiently compensated for the benefit he conferred upon EchoNous from June 2020 through October 25, 2021")]; and (4) as to measurable benefit, his work was the foundation for a partnership with a specific customer, US2ai, see [id. ¶ 13]. For purposes of a motion to dismiss, these allegations are enough, and accordingly the Court denies EchoNous' motion to dismiss.

### III.     MOTION TO TRANSFER

#### A.     Legal Standard

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  The venue transfer provision "was designed as a 'federal housekeeping measure,' allowing easy change of venue within a unified federal system."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981) (quoting Van Dusen v. Barrack, 376 U.S. 612, 636 (1964)).  "The decision to transfer a case under § 1404 lies within the discretion of the trial court," First State Ins. Co. v. XTRA Corp., 583 F. Supp. 3d 313, 318 (D. Mass. 2022) (citing Astro-Med, Inc. v. Nohon Kohden Am., Inc., 591 F.3d 1, 12 (1st Cir. 2009)), and calls for "an 'individualized, case-by-case consideration of convenience and fairness,'"  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen, 376 U.S. at 622).

When considering a motion to transfer venue, courts consider both private and public interest factors, including "1) the plaintiff's choice of forum, 2) the relative convenience of the parties, 3) the convenience of the witnesses and location of documents, 4) any connection between the forum and the issues, 5) the law to be applied and 6) the state or public interests at stake."  Momenta Pharm., Inc. v. Amphastar Pharm., Inc., 841 F. Supp. 2d 514, 522 (D. Mass. 2012) (citing Holmes Grp., Inc. v. Hamilton Beach/Proctor Silex, Inc., 249 F. Supp. 2d 12, 17 (D. Mass. 2002)).  Because "[t]he overriding principle in any transfer analysis . . . is that 'the plaintiff's choice of forum is entitled to great weight,'" it is the defendant's burden to show that transfer of venue, here to the Western District of Washington, is warranted.  Shipley Co., Inc. v.

14

Clark, 728 F. Supp. 818, 823 (D. Mass. Jan. 16, 1990) (quoting Home Owners Funding Corp. of Am. v. Century Bank, 695 F. Supp. 1343, 1347 (D. Mass. 1988)).

**B.     Discussion[5]**

1.     Plaintiff's Choice of Forum

First, "when more than one proper venue exists, 'there is a strong presumption in favor of the plaintiff's choice of forum.'"  Adams v. Fed. Bureau of Prisons, 716 F. Supp. 107, 113 (D. Mass. 2010) (quoting Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000)).  Here, EchoNous apparently argues that "the operative facts of the case have no material connection with this district," and thus "plaintiff's choice of forum carries less weight."  [ECF No. 10 at 13 (quoting United States ex rel. Ondis v. City of Woonsocket, R.I., 480 F. Supp. 2d 434, 436 (D. Mass. 2007) (citation omitted)].  Bulwer's allegations that he is a Boston resident, [Compl. ¶ 3],[6] and that he provided the relevant services "primarily from Boston," [id. ¶ 11], undermine the argument that the operative facts have no material connection to this district.  Accordingly, this factor weighs against transfer.[7]

2.     Relative Convenience of the Parties

Second, EchoNous appears to argue that it "would be more inconvenienced by sending witnesses," most of whom reside in Washington, to Massachusetts, than Bulwer, who "is the

---

[5] The parties do not appear to dispute that the case could have been brought in the Western District of Washington, and thus the Court turns directly to the factors relevant to the transfer analysis.

[6] Although "the weight to be accorded plaintiff's choice of forum varies with the circumstances of the case," Fed. Ins. Co. v. XTRA Intermodal, Inc., No. 14-cv-14010, 2015 WL 4275181, at *4 (D. Mass. July 15, 2014) (quoting Brant Point Corp. v. Poetzsch, 671 F. Supp. 2, 5 (D. Mass. 1987)), a great degree of deference is afforded to plaintiffs who, like Bulwer, select their home forum, see Piper Aircraft Co. v. Reyno, 454 U.S. 235, 256 (1981).

[7] For the same reason, the Court finds that the fourth factor—any connection between the forum and the issues—is at best neutral as to whether the case should be transferred.

only witness in Massachusetts," would be by traveling to Washington.  [ECF No. 10 at 15].

"Because there is a presumption in favor of plaintiff's choice, transfer is not appropriate where

its effect is merely to shift the inconvenience from one party to the other."  Kleinerman v.

Luxtron Corp., 107 F. Supp. 2d 122, 125 (D. Mass. 2000).  Accordingly, this factor weighs

against transfer.

### 3.      Convenience of the Witnesses and Location of Documents

Third, "[w]hile the development of digital technology has caused the importance of the

location of documentary evidence to wane, the convenience of expected witnesses remains

'probably the most important factor' bearing upon a motion to transfer."  First State Ins. Co., 583

F. Supp. 3d at 319 (quoting Boateng v. Gen. Dynamics Corp., 460 F. Supp. 2d 270, 275–76 (D.

Mass. 2006)).  With respect to witnesses, there is a "preference of live testimony over testimony

by deposition."  Kleinerman, 107 F. Supp. 2d at 125.  "If, however, a court order or the

persuasion of an employer who is a party to the action can secure the appearance of witnesses

regardless of the location of the forum, that factor becomes less important."  Id. at 125–26.

EchoNous argues that this factor weighs strongly in favor of transfer because, among

other things,

> likely witnesses are significantly less inconvenienced if they could testify from their
> home state, rather than Massachusetts, which is located thousands of miles away.
> EchoNous's witnesses are more likely to be able to testify in person—an important
> factor for a defendant in allowing the jury to assess credibility—if this matter is
> transferred to the Western District of Washington.

[ECF No. 10 at 15].  Because EchoNous can compel the attendance of its company witnesses,

this factor is less important to the analysis, and thus the Court finds that it is at best neutral as to

whether transfer is appropriate.

4.      Law to be Applied

Fourth, EchoNous argues that "[t]he parties' Agreement mandates that disputes are

governed by the laws of Washington State and a judge from the Western District of Washington

is fully capable of deciding the issues presented."  [ECF No. 10 at 16].  As explained above,

based on the facts alleged at this stage, the Forum Selection Clause does not apply.  See supra.

Thus, at this stage, this factor weighs against transfer.

5.      State and Public Interests at Stake

Finally, EchoNous argues that "Washington has more of an interest in adjudicating

disputes involving companies within its borders, whereas Massachusetts has little interest in

regulating the conduct of an out-of-state company, particularly where Bulwer was not even an

employee of EchoNous."  [ECF No. 10 at 16].  Although Washington State may have an interest

in claims relating to its businesses, see, e.g., Tile, Inc. v. Everythingdeals, No. 19-cv-12081,

2020 WL 13606298, at *5 (D. Mass. Apr. 10, 2020) ("New Jersey has an interest in adjudicating

claims against businesses within its jurisdiction."), R&R adopted sub nom. Tile, Inc. v.

Everything Deals, No. 19-cv-12081, 2020 WL 13606268 (D. Mass. May 7, 2020), Massachusetts

also has an interest in claims relating to its individual residents, see Shelton Bros., Inc. v. Aleph

Wines Corp., No. 13-cv-30180, 2014 WL 4656635, at *6 (D. Mass. July 21, 2014)

("Massachusetts has an interest in protecting the legal and economic interests of its citizens and

corporations."), R&R adopted, No. 13-cv-30180, 2014 WL 4657109 (D. Mass. Sept. 10, 2014).

Thus, this factor is neutral as to whether transfer is appropriate.

 Accordingly, having considered the relevant factors for transfer and finding that they all

weigh against transfer or are neutral, the Court denies EchoNous' request to transfer.

## IV.    CONCLUSION

Accordingly, EchoNous' motion to dismiss, or in the alternative, transfer, [ECF No. 9], is

DENIED.

**SO ORDERED.**

March 29, 2024                                          */s/ Allison D. Burroughs*
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE